### In re McRAE'S WILL.

County Judge's Court, Dade County.

March 5, 1954.

John Ruff, South Miami, for the proponent.

Frederick M. Lucarelli, Miami, for the contestant.

## FRANK B. DOWLING, County Judge.

Duncan McRae died at Jackson Memorial Hospital, Miami, on January 25, 1954. At the time of his death he was domiciled at 630 N. E. 22nd Terrace, Miami, and was 54 years of age. He left no surviving spouse, whether there are surviving lineal descendants is not known. He had been married to Barbara F. Freeman but they were divorced in September 1948—by subsequent marriage she is now known as Mrs. Barbara F. Lett.

On January 26, 1954 Mrs. Lett filed her "Petition for Probate of Last Will and Testament of Duncan McRae," producing for probate an alleged will dated January 24, 1954 (it is alleged, however, that it was executed on January 25, 1954) wherein the testator bequeathed and devised all his estate to Mrs. Lett, naming her as executrix without bond.

On the same day, January 26, 1954, Mrs. Sophia Kanchis filed her "Petition for Probate of Last Will and Testament of Duncan McRae," producing for probate an alleged will dated November 3, 1948 wherein he bequeathed and devised all his estate to Mrs. Kanchis, likewise naming her executrix without bond.

On January 28, 1954 Mrs. Kanchis petitioned for an order denying Mrs. Lett's petition for probate of her will on the grounds that on January 25, 1954 the decedent was not of sound and disposing mind and was not competent to make a will and that Mrs. Lett exercised undue influence upon him in securing the execution of the will of that date. I have heard the testimony of the witnesses for the proponent of the will dated January 25, 1954 (Mrs. Lett) and the contestant (Mrs. Kanchis), have examined the documentary evidence and heard the argument of counsel for the parties.

McRae was an air conditioning expert and engineer employed by Pan American Airways, resided alone in an apartment at the Miami address stated above. He was in apparent average good

health until September 1953 when he had a thyroid operation and was also suffering from a virus infection. Due to an operation affecting his vocal chords he could talk only in a whisper and with visible effort. On December 16, 1953 he was admitted to Jackson Memorial Hospital complaining of severe pain beneath his right scapula and on December 17 was operated upon by opening of the chest for exposure of the right lung on a diagnosis of lung tumor. The operation revealed he was suffering from cancer (carcinoma of the right lung with metastasis of the right chest wall), disclosing a condition that could not be relieved or cured by surgery—and the patient was therefore closed and returned with a prognosis of "very poor." He returned from the hospital to his apartment on December 24.

McRae had the usual friends and acquaintances natural to a man of his position and years. He seemed to enjoy cordial relations with other employees of Pan American Airways. One of the friends he knew and who had rendered kindnesses and attention to him during former illnesses was Mrs. Kanchis, a married woman living with her husband and family. This friendship between McRae and Mrs. Kanchis, purely platonic and strictly honorable so far as the record before this court shows, existed over a period of several years. Except for one or two isolated instances there is no showing in the record that any association of any character existed between McRae and his former wife Barbara from the time of their divorce in 1948 until three days before his death in 1954.

On his return to his apartment on December 24 and until January 11, 1954 he was cared for by friends. Christopher Hillesheim, an employee of Pan American Airways and resident at the apartment house, gave him much attention and care. The apartment house managers, Mr. and Mrs. W. D. Ingram, were very attentive to him, and each morning and evening Mrs. Kanchis called to prepare food for him and take care of his creature comforts.

On January 11 he was in an enfeebled physical condition, he showed a wandering of his mind in that he was not oriented as to time and place, was confused and unable coherently to express himself or control his actions. He was taken to his physician and on his advice taken to Jackson Hospital where he was admitted that evening. Upon being admitted to the hospital he stated he had no relatives, that his nearest friend and the one to be notified in case of emergency was Mrs. Kanchis, and next after her Mr. and Mrs. W. D. Ingram—Mrs. Lett was not mentioned.

Two doctors attended him, first Dr. DeWitt C. Daughtry, the surgeon who performed the exploratory chest operation in December, then Dr. Matt P. Meehan. The medical record at the

hospital shows that on January 12, the day after admission, Dr. Daughtry noted him as being "disoriented," and on January 13 noted on the progress record—"He does not wish to see his ex-wife. Says he has no son. Definitely not responsible for his activities. Climbs out of bed and does not know where he is." On January 15 the record showed no change. On January 18 Dr. Daughtry transferred the patient to Dr. Meehan's care. In testifying before the court both doctors stated unequivocally that he was unable coherently to express himself, was incapable of rational thought and completely incompetent at all times from his admission to the hospital until the time of his death. They further stated they were unable to talk to him, he could not grasp what they said and they were unable to understand him rationally.

The medical records kept by the nurses at his bedside bear out the doctors' opinions as to competency, a study thereof from the day of entry until he died reveals that he was in a perpetual state of "mental confusion," would get out of bed and "wander around" not knowing where he was, that he seemed "dazed" at times, was not coherent, that siderails were put on his bed to keep him in it. On January 14 he was out of bed and found "wandering in the halls, confused." On the 15th he wandered through the halls and into other rooms upsetting the patients so that restraints had to be applied to keep him in bed, when the restraints were removed later in the day he again "left his bed and wandered about in a confused condition," he was "noisy and disoriented." On the 16th he had to be restrained and later in the day both his arms had to be restrained, on the 17th his condition was unchanged except that he became lethargic. During this time pheno-barbitrates had to be administered to quiet him. On the 18th it was noted that he was "continually mumbling." Beginning about the 17th and continuously thereafter until death he lost control of his bladder, several times daily his bed was saturated with urine. On the 20th he was "disoriented" and had to be restrained in bed almost the entire day, on the 21st he was "poorly oriented" and had to be physically restrained, on the 22nd he was "unable to express himself clearly" —and during this period involuntary stools and voiding of urine continued.

On January 23 Barbara F. Lett appeared at the hospital, seeking to visit him. In view of the notation on the chart made by Dr. Daughtry she was not permitted to see him until the nurse had gone to his room and obtained his consent. The testimony shows that a few days before she called an attorney to ascertain whether a will leaving his property to her which he executed while he was her husband was still good and was advised that that will was no longer valid under Florida law.

On the first day she was allowed to see him in the hospital she became active in the preparation of a new will. She consulted his lawyer requesting him to go with her to the hospital to talk to him about a will. This attorney, Fred Lucarelli, Esq., refused to go in company with her but said he would go to see him that day and find out his wishes. That evening he went to see him but found him in such condition that he was unable to talk to him, and on Sunday morning so advised Mrs. Lett.

She immediately sought the services of another attorney who dictated to her over the phone the will she now offers for probate, she typed it and later that evening at the hospital (on Sunday, January 24) she met the attorney who had dictated the will to her, where she went in company with her father. She was allowed to see McRae but he was in such condition that when the attorney saw him he suggested it would be unwise to try to get the will executed that evening, and they would have to come back later.

The next morning (on Monday, January 25) she again went to the hospital, calling to the hospital two employees of the nursery company where her father was superintendent and having them come from South Miami to the hospital to act as witnesses to the will. Some time between ten in the morning and noon (on January 25) it is alleged Duncan McRae executed the will in the condition that it appears in the file, as shown by the photostatic copy. The signature is illegible. There is not a single well formed letter. No stranger to the transaction could conceivably decipher any signature at all. Duncan McRae died that evening at 8:30.

Much evidence was offered with respect to the execution of the purported will, the attempted conversations, the efforts made to exchange thought or communication between witnesses and the decedent. None of the testimony offered by the proponent is convincing to the court that Duncan McRae, at the time of the execution of the will, understood the nature of his act, knew that he was executing a will, knew the extent of his property or the natural objects of his bounty.

The two nursery employees who testified before the court as attesting and subscribing witnesses had never met him before, had never held a conversation with him, did not hold a conversation with him on that day, and from careful consideration of their testimony I find they had no knowledge and acquired no knowledge of the competency of the testator to make a will or his wishes and desires with regard to it. There is almost a total lack of convincing or satisfying evidence to show any of the elements necessarily attendant upon the execution of a will.

I have carefully considered the evidence and particularly the medical record in evidence in this cause, as well as the testimony of the two attending physicians, and find therefrom that the deceased, Duncan McRae, was unaware of the nature of his act, was incapable of understanding the contents and purport of the instrument he is alleged to have executed, could not have known the extent of his estate or the natural objects of his bounty, and therefore did not have testamentary capacity on January 25, 1954 at the time of the execution of the alleged last will and testament.

It is therefore ordered and adjudged that Barbara F. Lett's petition for probate of the alleged last will and testament of Duncan McRae dated January 25th (24th), 1954 be and it is denied.